**EDITORS PRESS, INC.**

v.

**UNITED STATES of America.**

**Civ. No. K–74–151.**

United States District Court, D. Maryland.

June 30, 1975.

---

**2.** This order of the Court is effective without any assent of the jury. Rule 50(a), *supra.*

408

Thomas D. Washburne, Baltimore, Md., Robert V. Schnabel, Robert D. Powell, Washington, D. C., for plaintiff.

Edward J. Snyder, Dept. of Justice, Washington, D. C., Jervis S. Finney, U. S. Atty., and Gerard P. Martin, Asst. U. S. Atty., Baltimore, Md., for defendant.

FRANK A. KAUFMAN, District Judge.

Plaintiff, Editors Press, Inc., a Delaware corporation with its principal place of busi-

ness in Hyattsville, Maryland (hereinafter referred to as "EP"),[1] seeks a total income tax refund of $91,772.20 plus interest.[2] Jurisdiction exists pursuant to 28 U.S.C. § 1346(a)(1).[3] The parties each seek summary judgment pursuant to Federal Civil Rule 56.

EP's refund claim is based upon its contention that it invested a total of $1,311,031.42 in new property, *i. e.,* a Harris-Cottrell web offset printing press composed of six lithographic perfecting units, together with certain auxiliary and accessory equipment, prior to April 19, 1969 and that it is entitled to the 7% investment tax credit provided by 26 U.S.C. §§ 38(a) and 46(a)(1).[4]

Section 49(a) of the Internal Revenue Code, 26 U.S.C. § 49(a), provides in part:

§ 49. *Termination for period beginning April 19, 1969, and ending during 1971.*

(a) *General rule.* For purposes of this subpart, the term "section 38 property" does not include property—

(1) the physical construction, reconstruction, or erection of which is begun after *April 18, 1969,* or

(2) which is acquired by the taxpayer after *April 18, 1969,* other than pre-termination property. [Emphasis supplied.]

The phrase "pre-termination property" is defined in section 49(b) which in subsection (4) thereof provides:

(4) Machinery or equipment rule. Any piece of machinery or equipment—

(A) more than 50 percent of the parts and components of which (determined on the basis of cost) were held by the taxpayer *on April 18, 1969, or are acquired by the taxpayer pursuant to a binding contract which was in effect on such date,* for inclusion or use in such piece of machinery or equipment, and

(B) the cost of the parts and components of which is not an insignificant portion of the total cost,

shall be treated as property which is pre-termination property. [Emphasis supplied.]

The principal question presented herein is whether there was, within the meaning of section 49(b)(4), a "binding contract" in effect on April 18, 1969 pursuant to which EP purchased the machinery for which it claims the investment tax credit. By

1. EP is engaged in the business of printing and, *inter alia*, prints several nationally known periodical publications. It is a subsidiary of Kiplinger Washington Editors.

2. EP reports its income for federal income tax purposes on a calendar year basis. In its original complaint plaintiff sought a refund of $35,563.49 of EP's 1967 income tax and $19,993.30 of EP's 1968 income tax. Subsequent to the filing of that complaint the Internal Revenue Service disallowed EP's claim *for a deduction* of $36,215.41 on its 1970 tax return. After paying that sum, EP, without objection by the Government, was permitted by this Court to amend its complaint to include that amount. All three refunds are related to the April *1969* transaction at issue in this case. EP has claimed with respect to each of the three different years—on a carry-back basis insofar as the years 1967 and 1968 are concerned—only because of the ceiling in the amount of the investment tax credit which it as a taxpayer could claim as to a single tax year. There is no dispute herein about the total amount claimed, or about any of the other computations involved.

3. That section provides:

(a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:

(1) Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws;

\* \* \* \* \* \*

4. Section 38(a) provides:

§ 38 *Investment in certain depreciable property.*

(a) *General rule.* There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part.

Section 46(a)(1), which is included within said subpart B, provides:

§ 46 *Amount of credit.*

(a) *Determination of amount.*

(1) General rule. The amount of the credit allowed by section 38 for the taxable year shall be equal to 7 percent of the qualified investment (as defined in subsection (c)).

agreement among the parties the case was submitted by the parties upon depositions and legal memoranda. There is seemingly no material and relevant factual dispute nor have any issues of credibility or reliability of any of the deposition testimony been indicated. Thus, what is posed for resolution is whether upon the facts of this case there was in existence, as a matter of applicable law, a "binding contract" on or before April 18, 1969.

## FACTS

Beginning in 1966 and continuing into 1967 there was discussion among management personnel at EP about EP's additional needs for space and plans for further growth. Late in 1967 EP's two unit web offset press purchased in 1960 had become almost inoperable and employees in EP's manufacturing section had begun to put pressure on management to acquire a new press. On December 5, 1967, Herbert Morrow, Jr., Vice-President and General Manager of EP, presented that information at a meeting of the EP Board of Directors. The minutes of that meeting indicate that Morrow emphasized EP's need, within the following twelve to eighteen months, to acquire a new high-speed sticher and a new two, four or six unit rotary press to replace the dilapidated two unit one. Morrow suggested that a study be made to determine the exact equipment needed and estimated that the cost of the new press would be between $275,000 and $1,110,000 depending upon the number of units ordered. During the next several months, certain of EP's management personnel attended a number of meetings, both internal and with various representatives of other companies regarding EP's proposed plant modifications and proposed purchase of a new press. At a meeting of the EP Board of Directors on July 30, 1968, Morrow discussed both long range and short range expansion plans. As to the long range, Morrow stated that additional space, additional bindery equipment

and a new rotary press would be needed within eighteen to twenty-four months and that for the short run, more office space and two new stichers were required. The directors agreed in principle with Morrow's recommendations. Further meetings regarding the acquisition of new plant space for EP's expansion were subsequently held with EP's parent company, Kiplinger.[5] Thereafter, EP identified its space needs, and Kiplinger approved EP's request for some 3500 to 4000 square feet of plant space. On October 10, 1968, George Williams, EP's General Superintendent, submitted a request to Robert Cookingham, Eastern District Sales Manager for the Cottrell Company,[6] for a price quotation for a M–1000 Cottrell web offset press. Apparently EP approached Cottrell because EP had been well satisfied with the performance of a four unit M–1000 web press which EP had acquired from Cottrell in 1965. On October 11, 1968, Cottrell sent EP Quotation No. 129 in response to EP's aforesaid request. During early October, there were internal discussions at EP concerning EP's selling certain of its old presses so as to free floor space for a new press. On October 18, 1968, EP did sell one of its old presses for $25,000. During an internal meeting on October 26, 1968, Morrow and several other employees of EP discussed the relative merits of purchasing a new four unit or a six unit press. Morrow stated that, at that time, his view was that the purchase of a new web offset press should take place "just like next week, or within this month."[7]

On November 14, 1968, during a meeting held in EP's plant, all equipment was stopped and the employees were told of EP's expansion plans, all of which were to be put into effect immediately except that the purchase of the new press was to be delayed until a decision was reached as to the number of units to be purchased. Between October 14, 1968 and February 1969,

5. See n.1 supra.

6. Cottrell is a subsidiary of Harris-Intertype Corporation.

7. Morrow Deposition at 42.

although Cookingham visited the EP plant each month soliciting orders, EP took no further steps to effect the purchase of the new press. However, during that period, EP did purchase new trucks to carry the greater loads expected as a result of expansion and did hire additional employees with expansion in mind. However, such expansion could not take place without the new press. Morrow has stated that he delayed purchase of the press while EP attempted "to beef up our sales effort"[8] before it actually acquired the press.

Early in March 1969 EP was successful in acquiring or retaining several major clients whose orders could not be handled expeditiously by EP without a new six unit press. At an EP Board Meeting held on either March 17 or March 19, 1969,[9] Morrow reviewed his activities since October 1968 and recommended purchase of a six unit M–1000 Cottrell web press. Thereupon, the Board of Directors adopted the following resolution:

> RESOLVED, that Editors Press purchase a six unit Harris-Cottrell rotary press subject to price and configuration details as approved by the Vice President.

Prior to that meeting, Morrow, who had been informed through the parent Kiplinger company that it was possible that the investment tax credit would shortly be repealed, has stated that he tried to condense his timetable and make the final purchase quickly.[10] On April 8, 1969, Williams, EP's General Superintendent, telephoned Cookingham at Cottrell, and asked Cookingham for an update of the October 11, 1968 quotation for a six unit M–1000 Cottrell web press, stating that EP "wanted" that press, asking that Cookingham "reserve" it for EP, and advising Cookingham that further discussions as to the ancillary and auxiliary items needed along with the press itself

would follow.[11] That same day, Cookingham responded with the following letter to which was attached a three-page document captioned "Quotation 155":

April 8, 1969

Mr. George D. Williams
Plant Superintendent
EDITORS PRESS, INC.
6041 33rd Avenue
Hyattsville, Md. 20782

Dear George:

In accordance with our phone conversation this morning I am attaching a revised quotation, # 155, dated April 8, 1969, which updates Quotation # 129, sent you on October 11, 1968, both in price and specifications.

In accordance with your request *we have reserved a spot in our manufacturing schedule* for six 23½″ printing units, 3 folders, infeeds, chill rolls, and other standard components *subject to your issuing a purchase order and deposit check* to us for these items when I visit you on Tuesday, April 15.

I suggest that you include the three Wood reels in your purchase order, as delivery has been quite slow from these people, and an order should be placed promptly.

We should set up a date for you and your people to visit our plant and go over the details of the configuration of this press and auxiliary equipment with our engineers as promptly as possible *so that a definitive contract can be written which will include the auxiliary items needed for this press, and determine which of the auxiliary items you intend to purchase from us and which of the items you will buy direct from the manufacturer.*

---

8. Morrow Deposition at 111.

9. The exact date of that meeting is not clear. However, what took place at that meeting is uncontroverted, as is the fact that that meeting did not take place later than March 19, 1969.

10. Morrow Deposition at 119.

11. Cookingham Deposition at 36.

If there is any further information you need prior to my visit, please call me. Best regards.

> Sincerely,
> THE COTTRELL COMPANY
> A Division of Harris-Intertype Corp.
> (s) Bob

RTC:rg   R. T. Cookingham
Enc.    Eastern District Manager

[Emphasis supplied.]

In an attachment to that letter Cookingham quoted prices which he had specifically discussed during the preceding two or three weeks with his superior, Herbert Asten, Cottrell's General Sales Manager. Also on April 8, 1969, Cookingham called the Cottrell plant in Westerly, Rhode Island and stated that EP wanted Cottrell to reserve certain units. On April 10 and 11, 1969, after receiving Cottrell's April 8th letter,

Morrow and several other EP personnel met to consider the entire matter and " * * * really got down to the nitty-gritty of the specific press and part of it that we intended to purchase." [12]

On April 15, 1969, Cookingham came to EP, discussed Cottrell's quotation and the various available accessories, emphasized the imminence of the repeal of the investment credit, urged EP to get its order in as soon as possible, and stated that before a spot on Cottrell's manufacturing schedule could be reserved for the production of the press, EP would have to issue a purchase order, at least for the basic unit.[13] On that same date—April 15, 1969—EP issued the following purchase order for the acquisition of, *inter alia*, one six unit M–1000 Cottrell web press and certain auxiliary equipment, for a price of $887,800.00:

*Editors Press, inc.*
6041 - 33rd Avenue, Hyattsville, Maryland 20782
779-7800

PURCHASE ORDER
Valid only if numbered and signed below

PURCHASE ORDER
No. 25337
Job No. Equipment

April 15, 1969

TO  The Cottrell Company
    Attn: Mr. Robert Cookingham*
    Westerly
    Rhode Island

COTTRELL CO. N.Y.C.
REC'D  APR 17 1969

IMPORTANT
Both Order and Job No.'s Must Appear On All Invoices and Packages.

Delivery Date   Complete by Sept. 30, 1969

| QUANTITY | DESCRIPTION | PRICE | PER | AMOUNT |
|---|---|---|---|---|
| 1 | 23-1/2" X 38" Cottell M-1000 Web Offset Press. 6 Printing units, automatic tension infeed, chill rolls, one combination folder, dryer framing, control console & plate bender, all for 3-web operation. | | | |
| 1 | additional combination folder | | | |
| 1 | 2-former folder | | | |
| 3 | Wood Economy Reels, Model III | | | |
| | Check for deposit ($10,000.00) to follow within 10 days. | | | $ 887,800.00 |
| | Note: This P.O. is for basic components of the equipment line; other specifications and selection of ancillary equipment to follow. *Ref. your quotation letter of April 8, 1969. | | | |

Please Notify Us Immediately If You Are Unable To Ship Complete Order By Date Specified

Received By _____   Date _____

VENDORS COPY

Authorized Signature

The April 8th Cottrell letter had indicated that the reservation of a spot on the Cottrell manufacturing schedule depended on the issuance of a purchase order and a

---

12. Morrow Deposition at 114.

13. Cookingham Deposition at 37.

"deposit check". However, during the April 15th meeting, Morrow had explained that it would be difficult to furnish a check due to the lateness of the hour (approximately 5:30 p.m.). Cookingham thereupon stated that it would not be necessary for the check to accompany the purchase order and that it would be satisfactory for the check to be mailed to Cottrell. It apparently was not unusual for a customer's check not to accompany its purchase order addressed to Cottrell. In that regard, Cookingham has stated that he did not feel any less secure about the "deal" because of the absence of the check.[14] Although Cookingham seemingly had not been given any specific authority to waive the requirement of the deposit check, he apparently had so done in the past without criticism by his superiors at Cottrell.[15] On April 24, 1969,

Morrow sent to Cottrell EP's $10,000 check as the deposit referred to in the April 15, 1969 purchase order.

On April 15, 1969, after Cookingham received the EP purchase order, he telephoned Asten, Cottrell's General Sales Manager, and informed Asten that " * * * we have a firm order" from EP.[16] The next day, when Asten returned to his office he spoke with the Sales Office Manager of Cottrell and told him that " * * * we have got Editor's [sic] Press".[17] That day, April 16, 1969, Asten put the Editors Press order into the Cottrell production schedule. In a letter to Morrow dated April 17, 1969, Cookingham wrote, in part:

Thank you for your Purchase Order * *. covering the M–1000 Cottrell press..

**14.** Morrow Deposition at 135–37; Cookingham Deposition at 41–42.

**15.** The Government apparently contends not only that Cookingham lacked the authority to waive the requirement of the deposit check, but more generally that Cookingham had no authority to contract on behalf of Cottrell at all. Seemingly, that argument is based on deposition testimony by Charles M. Baker, Jr., Vice-President and General Manager of Cottrell, that in 1969 he was the only employee of Cottrell specifically authorized to execute contracts on its behalf. Baker Deposition at 12–17. However, there is absolutely no evidence that EP was ever put on notice of any inability on Cookingham's part to bind Cottrell. Accordingly, Cookingham seemingly had apparent authority to bind Cottrell. See RESTATEMENT (SECOND) OF AGENCY §§ 8, 27 (1958). Cookingham himself indicated that he had sufficient authority "to get things going" without a check, Cookingham Deposition at 30, and that in this case none of his superiors questioned his actions, Cookingham Deposition at 42. Furthermore, Baker's deposition goes on to make it clear that the purchase order, which Cookingham was clearly authorized to accept, was the "instrument of action so far as [Cottrell] * * * [is] concerned * * * * *" and upon which Cottrell, in dealing with a number of customers, had initiated production of, and ultimately produced equipment with a value of millions of dollars. Baker Deposition at 18. Thus, Cookingham possessed the ability in fact to commit Cottrell to a course of action involving great sums of money, and thus seemingly possessed actual as well as apparent authority. In any event, even if Cookingham did not have authority to contract on behalf of Cottrell, it would appear that by its subsequent actions, including in particular Baker's eventual signing of the "definitive contract" which was based on the Cookingham-Morrow agreement of April 15, 1969, Cottrell ratified Cookingham's action and so made it effective and binding. See 1A A. CORBIN, CONTRACTS § 229 at 340 (1963); see also RESTATEMENT (SECOND) OF AGENCY § 82 (1958) which provides:

Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him. [Emphasis supplied.]

Accordingly, even if Cookingham's actions were not authorized by Cottrell in advance, Cottrell's subsequent ratification retroactively made them effective and valid as of the date upon which they were made, i. e., April 15, 1969, at least insofar as EP and Cottrell are concerned. Nevertheless, the question arises as to whether such ratification is effective as of April 15, 1969 for purposes of satisfying section 49(b)(4)'s time requirement. That issue, however, need not be resolved herein in the light of the existence of both actual and apparent authority on the part of Cookingham.

**16.** Cookingham Deposition at 43.

**17.** Asten Deposition at 18–19.

This purchase order will be forwarded to our general office to insure you a delivery position in our manufacturing schedule.[18]

On April 28, 1969, Morrow and Cookingham discussed the required ancillary equipment and on April 29, 1969 they agreed in substantial part with regard thereto, and agreed without changing the price for the press itself that the total price of the press and auxiliary items would be $1,082,980.00. On June 30, 1969, pursuant to the agreement of April 29, 1969, EP mailed a check in the amount of $100,460.00 to Cottrell. The April 29th agreement was written up during this period on a standard · Cottrell order form which was signed by C. M. Baker, Jr., as Vice-President and General Manager of Cottrell, on August 8, 1969. On the day before, i. e., on August 7, 1969, after additional meetings between EP and Cottrell personnel, a number of minor changes in the auxiliary equipment EP was to receive were made, and an amendment to the April 29th listing was made, increasing the total price by a net amount of $22,345.00 for a new total before tax of $1,105,325. No change was made in connection with the price of the press itself and the largest individual addition in total price involved $4425. The April 29th listing was again modified on August 27, 1969 by adding two minor items at a total additional cost of $4055. A final adjustment was made to the April 29, 1969 listing on October 15, 1969, which amounted to a net reduction of $280. The final total was $1,109,100 to which was added $22,182 in Maryland state taxes for a total of $1,131,282.00.[19]

In construing the words "binding contract" as used in section 49(b)(4), the legislative history of the Tax Reform Act of 1969, Pub.L. No. 91–172, 83 Stat. 487, is illuminating. The Report of the Senate Finance Committee which accompanied the Tax Reform Act contains the following:

(iv) Binding contracts.—Under both versions of the bill the investment credit is to be available with respect to property which is constructed (reconstructed or erected) or acquired pursuant to a contract that was binding on the taxpayer at the close of April 18, 1969, and at all times thereafter. * * *

\* \* \* \* \* \*

Whether or not an arrangement between a taxpayer and a builder or supplier constitutes a contract is to be determined under the applicable local law. A contract for this purpose may be oral or written. However, in the case of an oral contract, the taxpayer must establish by appropriate evidence that the contract was, in fact, entered into before the close of April 18, 1969. This may be done by memorandums, the conduct of the parties or other evidence that a contract was in fact entered into. State law as to the effect of "part performance," and as to when a seller has accepted an order will apply.

\* \* \* \* \* \*

A contract may be considered binding on a taxpayer even though (a) the price of the item to be acquired under the contract is to be determined at a later date, (b) the contract contains conditions the occurrences of which are under the control of a person not a party to the contract, or (c) the taxpayer has the right under the contract to make minor modifications as to the details of the subject matter of the contract. * * *

S.Rep.No.91–552, 91st Cong., 1st Sess., 1 U.S.Code Cong. & Admin.News pp. 2265–66 (1969).

EP, as indicated *supra,* is a Delaware corporation with its principal office located in Maryland.[20] Cottrell is a division of Har-

---

18. Cookingham Deposition at 45–46, Ex. No. 4.

19. Seemingly, the difference between that final figure of $1,131,282.00 and the figure of $1,311,031.42 is made up by the costs of ancillary and auxiliary equipment for the Cottrell press which EP purchased from manufacturers

other than Cottrell. In any event, the Government has not disputed herein the accuracy of EP's figures as to its total cost and this Court assumes that cost to be $1,311,031.42 as EP has claimed.

20. *See* p. 409 *supra.*

ris-Intertype Corporation. Cottrell is located at Pawcatuck, Connecticut across the river from Westerly, Rhode Island. There is no post office in Pawcatuck and so Cottrell uses the post office in Westerly. The final contract document which was accepted and dated at Pawcatuck on August 6, 1969 contained the provision that it "shall be governed by the laws of Connecticut." Thus, in this case, the applicable law is that of one or more of the states of Connecticut and Maryland and perhaps even of Rhode Island. The parties have not pointed to any variances material to this case among the laws of those three states. Nor does there appear to be any such variance. The Uniform Commercial Code was in force and effect in each of those three states prior to and at the time of the events herein. Conn. Gen.Stat.Ann. tit. 42a (1960); 8B Md.Ann. Code art. 95B (1964 Repl.Vol.); 1963 Laws of Maryland, ch. 538, § 3; 2 R.I.Gen.L. tit. 6A (1969). Further, all sections of the Uniform Commercial Code applicable to the issue posed herein, in the form quoted *infra,* were in force and effect in each of those three states during that period of time.

■ The equipment which EP purchased from Cottrell clearly comprised "goods" as that term is defined in Uniform Commercial Code § 2–105(1), 8B Md.Ann.Code art. 95B, § 2–105(1) (1974 Repl.Vol.).[21] Accordingly, article 2 of the Uniform Commercial Code is applicable.[22]

As to "binding contract" Uniform Commercial Code § 2–204 provides:

(1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both

parties which recognizes the existence of such a contract.

(2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.

(3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

The Official Comment to Uniform Commercial Code § 2–204 reads in part:

Subsection (3) states the principle as to "open terms" underlying later sections of the Article. If the parties intend to enter into a binding agreement, this subsection recognizes that agreement as valid in law, despite missing terms, if there is any reasonably certain basis for granting a remedy. The test is not certainty as to what the parties were to do nor as to the exact amount of damages due the plaintiff. Nor is the fact that one or more terms are left to be agreed upon enough of itself to defeat an otherwise adequate agreement. Rather, commercial standards on the point of "indefiniteness" are intended to be applied, this Act making provision elsewhere for missing terms needed for performance, open price, remedies and the like.

The more terms the parties leave open, the less likely it is that they have intended to conclude a binding agreement, but their actions may be frequently conclusive on the matter despite the omissions.[23]

---

**21.** That section provides, in relevant part:

(1) *"Goods"* means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (subtitle 8) and things in action. * * *

**22.** Section 2–102 of the Uniform Commercial Code provides, also in relevant part:

Unless the context otherwise requires, this Article applies to transactions in goods * * *.

**23.** *See also* S. Williston, Sales, § 7–2 at 203–04 (4th ed. 1974):

* * * Parties, when entering into negotiations looking toward the formation of a contract, often * * * either intentionally or accidentally leave terms of their contract to be decided at a later date. * * * Under the law of sales in the Code, a contract made between the parties which omits one or more terms to the contract is known as an Open Term Contract and the enforceability of that contract between the parties to the negotiation is not defeated by the fact that one or more of its terms are left open. This provision of the Code is: [Section 2–204(3)] * *

Thus, herein the focus is on the intention of EP and Cottrell as measured by what the Comment refers to as "commercial standards on the point of 'indefiniteness'". Viewed in that context there is little doubt as to the intentions of the parties as of April 15, 1969. Morrow has said that he felt himself "committed" to a contract with Cottrell by issuing the EP purchase order.[24] Cookingham has stated that he felt that he "absolutely" had a "firm contract" once he received the purchase order.[25]

Uniform Commercial Code § 2–207 is also relevant. It provides:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) The offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.

The Official Comment to that section provides, in part:

1. This section is intended to deal with two typical situations. The one is where an agreement has been reached either orally or by informal correspondence between the parties and is followed by one or both of the parties sending formal acknowledgments or memoranda embodying the terms so far as agreed upon and adding terms not discussed. The other situation is one in which a wire or letter expressed and intended as the closing or confirmation of an agreement adds further minor suggestions or proposals such as "ship by Tuesday," "rush," "ship draft against bill of lading inspection allowed," or the like.

2. Under this Subtitle a proposed deal which in commercial understanding has in fact been closed is recognized as a contract. Therefore, any additional matter contained either in the writing intended to close the deal or in a later confirmation falls within subsection (2) and must be regarded as a proposal for an added term unless the acceptance is made conditional on the acceptance of the additional terms.

·In the words of that Comment, as of April 15, 1969, "a proposed deal * * * in commercial understanding [had] in fact been closed" by EP and Cottrell. Simply put, that "deal" was for the sale by Cottrell to EP of a six unit Cottrell M–1000 web

---

If the parties to a particular transaction intended to enter into an arrangement in which they form a binding agreement, then this subsection gives recognition to that agreement as valid in law, even though the parties to the negotiations left out one or more of the terms.

While the Uniform Commercial Code contains and preserves provisions historically embodied in the Statute of Frauds, the April 15th documents not only seemingly avoid the pitfalls thereof, but neither EP nor Cottrell has ever asserted any Statute of Fraud type of defense.

See, e. g., 8B Md.Ann.Code § 2–201 (1964 Repl. Vol.). See also, e. g., 8B Md.Ann.Code § 1–102(1) (1964 Repl.Vol.) providing for article 2 of the Uniform Commercial Code to "be liberally construed and applied to promote its underlying purposes and policies" and 8B Md.Ann. Code § 1–103 (1964 Repl.Vol.) retaining principles of law and equity unless "displaced by the particular provisions of this article."

**24.** Morrow Deposition at 135.

**25.** Cookingham Deposition at 42.

offset press at a price of $771,800.00.[26] To the extent that EP's purchase order included other items and referred to "other specifications and selection of ancillary equipment" it was understood by the parties that, as the purchase order itself states, they were "to follow". As discussed *supra,* in fact, agreement as to the large majority of those items was reached by April 29.

■ Seen against the background of the above-quoted Uniform Commercial Code provisions, the facts fall into a simple pattern. Starting in 1967 EP began to realize it needed a new and possibly larger press and other equipment. Late in 1968 EP investigated the cost by asking about prices. Then EP went out and sought the additional business it needed in order to support the planned expansion. That business was on hand in early March 1969. Thereafter, EP's Board of Directors gave its general manager authority to buy a specific type and make of press. Ever since October of the previous year Cottrell had been aware that EP was considering buying a new press. Thus, when EP requested a quotation on April 8, 1969, Cottrell was able to respond

not with just a simple quotation but with a definitive offer at a named price for a specific press.[27] Since EP had already decided what press it wanted and since both parties were aware of the possibility of imminent repeal of the tax credit,[28] subsequent negotiations were brief and culminated in the EP purchase order of April 15, 1969 and the placing of the EP order into the Cottrell production schedule the next day. Subsequent actions by both parties were nothing more than agreement on details and execution of formalities. Common sense and commercial realities make it clear that April 15, 1969 was the date upon which a "binding contract" between EP and Cottrell came into effect.

■ Although that contract was only for the purchase of the press at $771,800.00,[29] EP is entitled, pursuant to section 49(b)(4) (*see* p. 3 *supra*), to the investment tax credit on the full $1,311,031.42 which it invested in the press and in the ancillary and auxiliary equipment. This is true because this Court holds that the press itself was "acquired by EP pursuant to a binding contract which was in effect" on April 18,

26. That was the price quoted in Cottrell's quotation of April 8, 1969. Both Cookingham and Morrow used that dollar amount as the starting point for computing the price stated in EP's April 15, 1969 order and in "Schedule A", listing all components and dated April 29, 1969. "Schedule A" was subsequently incorporated into the "definitive contract" signed by Cottrell's Vice-President and General Manager in August 1969. There is absolutely no indication in the record that as of April 15, 1969 or any time thereafter either EP or Cottrell ever doubted that EP had a contract to buy a six unit M–1000 press for $771,800.00.

27. In 1 A. Corbin, Contracts § 26 at 77–78 (1963), Professor Corbin wrote:

A quotation of prices is not an offer; for a mere quotation of price leaves unexpressed many terms that are necessary to the making of a contract. A quotation is usually a price per unit of quantity, as when corporate stock is quoted at $85 per share, hogs at $4.50 per hundred pounds, cotton at 12 cents per pound, or flour at $9 per barrel. Such a quotation leaves unstated the amount to be sold, the time and place of delivery, the terms of payment, and other matters usually agreed upon before closing a deal. As will appear below, the use of the word "quote" does not in itself prove that these other terms have

not been already agreed upon, tacitly or otherwise; but one who asserts a contract must show that they have been so agreed upon. A quotation of price, standing alone, is not an offer. [Footnotes omitted.]

The "quotation" which Cottrell made was obviously not the sort of "mere quotation in price" to which Professor Corbin refers. Asten, Cottrell's General Sales Manager, stated that the EP order was "quite a large order" and "a little different configuration" (Asten Deposition at 13). The specifics of the preparation of that quotation had been discussed on and off between Asten and Cookingham from October 1968 up to its issuance by Cottrell on April 8, 1969. Asten Deposition at 13–14. Agreement on some of the other terms referred to by Professor Corbin was reached during the April 15th meeting between Morrow and Cookingham. Any remaining open terms do not invalidate the contract under the provisions of Uniform Commercial Code § 2–204(3).

28. Morrow Deposition at 119; Cookingham Deposition at 71–73.

29. The April 15, 1972 purchase order (*see* p. 10 *supra*) covered within the price of $887,800.00 not only the press but certain other equipment.

1969, because the cost of the press was more than 50 percent (more than 58.8 percent in fact) of the total cost, and because there is no dispute that "the cost of parts and components" was not "an insignificant portion of the total cost". Thus, EP's entire investment falls within the definition of "pre-termination property" set forth in section 49(b)(4) and so is eligible for the investment tax credit. That that result was intended by the Congress is buttressed by the following example in the Senate Finance Committee Report accompanying the Tax Reform Act of 1969:

> Thus, for example, if there were a binding order on April 18, 1969, for the acquisition of the frame of an airplane, parts and components necessary for the airplane to become a functioning unit would also be eligible for the investment credit (even though not on order at that time) if these remaining parts and components did not account for 50 percent or more of the total cost of all the parts and components of the airplane. Accordingly, if the motors, galley, seats, navigation, and radio equipment and necessary spare parts acquired at the time the plane is put into operation had not been ordered before April 19, but constituted less than 50 percent of the total cost of the plane, the investment credit will be available not only with respect to the air-frame but also with respect to this machinery and equipment as well.

S.Rep.No.91–552, 91st Cong., 1st Sess., 1 U.S.Code Cong. & Admin.News, p. 2272 (1969).

Accordingly, judgment will be entered for Editors Press, Inc. in the amount of $91,772.20 plus interest as provided by law.